We appreciate it. Thank you. Mr. Goetsch, you may proceed. Good morning, Your Honors. My name is Jerry Goetsch, and I represent the appellant, Duvall. Excuse me. Mr. Kaplan, could you assist in adjusting the microphone, please? This is a very large room with high ceilings, and whoever stands or sits there has to talk loudly. I'll try and speak louder as well. Okay, good. Thank you. You're welcome. Thanks. I always let her ask the question, because I'm deaf in this ear, and I don't like telling everybody. Okay. Sorry for the interruption, if you want to start again. I represent Mr. Montgomery, and this case sort of boils down to the fact that Mr. Montgomery was a black man wearing a black shirt. That might seem like an exaggeration, but that's really what caused him to be a suspect and caused the police to subject him to an inherently suggestive show of identification, which led to his arrest, which then led to what you could call a newspaper identification, wherein the victim—there was a shooting at around 2 a.m. in the parking lot of the Buena Vista Apartments in Elgin, and the victim identified Mr. Montgomery from a newspaper article, presumably about the shooting, in which he saw his mug shot. Counsel, if we focus for a minute on the show-up, that show-up was conducted very near to the shooting, very close in time, while the police were still in fresh pursuit of a suspect who had fled. Why was this improper, and what could they have done differently here? Well, I think the characterization of fresh pursuit is a little bit off, in that they were staking out the apartment that Mr. Montgomery was trying to enter, and so it wasn't as though they were in hot pursuit of someone. No, it wasn't hot pursuit, but it certainly was within about 40 minutes of the shooting. Right. So however, whatever adjective would you use? The car had left, the car that was involved, the car that they were trying to tow had left. The person with dreadlocks was presumably seen by the security officer, in that he found someone with dreadlocks running away from the scene. So two of the three people involved presumably were gone. And the facts of it show Mr. Montgomery was trying to enter this apartment. We don't have any idea of how this apartment is connected to the shooting in any way. Well, so my question is, what was improper about the show-up? I mean, it has to be inherently suggestive. Well, that's the problem with a show-up, is that all show-ups are inherently suggestive. All right. But that really isn't the standard, is it? I mean, the standard, if a show-up is, let's say, inherently suggestive, but in order really to be problematic, it's got to be impermissibly suggestive or unnecessarily suggestive. So can you answer the question that I asked first, please? Yes. I think the real question is, was this necessary? Because a show-up is inherently suggestive. I think the law is pretty clear on that. It's just that is it necessary unnecessarily? So you're saying they shouldn't have done anything? No, no, no. I'm not saying that. Oh. So what should they have done? So they patted down Mr. Montgomery to find weapons. They could have searched his apartment for weapons. They searched this other apartment for weapons. There were other black men in the area that were in this other apartment where they found weapons. So presumably they could have presented more than one suspect. The only reason Montgomery was singled out was because he had a black shirt on. And the fact is that Kobe Dowell, the participant in the show-up, had misidentified his shirt and only identified him by his shirt. So if you listen to the 911 recording, he says it's a black sweatshirt. All right. But there was a description given as well of the person in terms of height, weight, approximate. So he matched that also, did he not? In my mind I was thinking, well, this is just an average description. So I went to the census data that I could find, and 80% of 20 to 29-year-old males fit the description. I mean, they didn't break it down by race, but 80% of males are shorter than 6 feet. Kobe Dowell said he was 5'6 to 5'7. Mr. Montgomery is actually 5'11. Kobe Dowell said he was 150 pounds. He's actually 250. So but if you also add in that they had the victim's description of 6 feet, 180. So there's a range there, 5'6 to 6 feet, 150 to 180. It describes 80% of males. Okay. But the police in presenting him did not say, this is the person, we found him. They asked him to take a look. No, but that's the problem with show-ups. They don't have to say, oh, this is the guy. You shine a spotlight on a guy that fits the description, yes, but also 80% of males fit that description. So is it your position that the police should never do a show-up? No, but the state site's case is where it is. Well, what was the problem here then? Well, the problem is the person that participated in the show-up didn't describe his shirt correctly. He described it first on the 9-1, but later as a T-shirt. Well, after he saw Mr. Montgomery, then he said, oh, yeah, that's the shirt. Well, the shirt has red lettering and a white sort of angle on the front, and on the back it has like two R's in white lettering. And if he had described a shirt that said, oh, yeah, I saw this guy, black T-shirt with red lettering or some sort of writing on it, then, you know, that would have been a much more accurate description. So is it your position that this tainted the in-court identification? Absolutely. And then does this not go to weight rather than admissibility? Of the in-court or of the weight? Allowing the show-up information? Well, the problem is trial counsel should have challenged these identifications, and that's ultimately the issue is that trial counsel did not file a motion to suppress. Right, but you have to show that that motion to suppress would have succeeded, correct? Right. And there's also the second ID, which I don't think there's any doubt that suppression of that ID would have been successful because the State in its brief admits that the ID was improper. It's an identification from a newspaper article about the crime. Well, there was cross-examination with respect to that, and quite frankly the answer could have been interpreted in two different ways, could it not? I mean, when he said, no, I identified him that day when I saw him in the paper, that could have meant that, yes, I recognized him from whatever information there was, but we don't have that newspaper article in the record, do we? Well, no, that's why a motion to suppress should have been filed. I mean, we know that he says he identified him. He didn't tell anyone until a week before trial. I mean, you can't look at a mugshot and, I mean, I'm not an expert in the psychology of this, but the reason why these courts and psychologists say that these are inherently suggestive is because people get them wrong quite often. In situations where you see a picture of someone and they're telling you this is the suspect, that's inherently suggestive. He did a proper, the police did a proper photo ID. They had a computer program and they showed it to the victim right after the crime, when presumably his memory would be the freshest. He didn't ID Devon Montgomery. He actually pointed to two other possible suspects. And that was done in the hospital while he was under medication. Isn't that correct? Yes. But if his, I mean, the officer that conducted it said he did not appear impaired in any way. He says, yes, I was on pain medicine. But if he doesn't identify him then, then how is an identification later better? It's not. It's arguably worse when you've got one picture in an article saying this is the guy. It's arguably that the, I believe he was taking three or four medications, and the officer did not ask him if he was under the influence of any medications. So we don't know whether or not, as the victim claims, put another way, the trier of fact determined that it was credible. It's not our position to question credibility. And he indicated that he was in a lot of pain because there was still a bullet inside his shoulder where the clavicle was broken. And so it's not unreasonable to conclude that if you're taking OxyContin and several other drugs and you're in pain, you don't necessarily, as he said, I believe he said he was cloudy, it's arguable, but it doesn't necessarily constitute persuasive or establish that it's against the manifest way to the evidence. Well, that's not the standard. I mean, it's an ineffective assistance argument that counsel should have challenged these IDs. I'm talking about his testimony. Yes. And the totality of the testimony. And if there was a motion to suppress, would there have been a newspaper article whose burden is it? It's trial counsel's. Yes. Defense counsel had to file a motion to suppress. And if we haven't seen the article, how are we supposed to determine whether it's prejudicial or not? Well, if you feel like seeing the newspaper article is necessary, even though the state has said it's improper. You implied if you didn't assert that it was, so that's why I took you at your word. Well, I think it's improper no matter what the newspaper article looks like. It's a mug shot in a newspaper article. Yes, that's not a proper way to identify a criminal defendant. Well, we don't know that. Was there a description that that's what the article was, a mug shot? The victim said when showed one of the mug shots, he said that's the picture I saw. Okay. So. Do you want to move on to one of your other points? Could I have one? I'm sorry. Go ahead. Was the picture that he saw in the newspaper the same picture that he saw in the hospital? Yes, it was. It was the mug shot. They showed him the mug shot that was shown to him as part of the array, and he said that's the picture I saw in the paper. And so I have to assume, I mean, again. He said that's the picture or that's the person? That's the picture. I do have one question about the show up. It wasn't Mr. Dowell, I guess his name is, or Duell. Wasn't he also presented with a female to look at from the same distance under the same circumstances? And didn't he say, no, that's not the person? That's correct. But the female he described as part of the shooting was petite, and then this other female was not. So she did not even fit the description of the female that he had already described. But admittedly, Devon Montgomery was a black man in a black shirt, so he fit the description. If he had been 6'6", no, he wouldn't have fit the description. Well, wasn't he? But he was, I mean, the suspect was described as basically average in every way except for black man with black shirt and short hair. Well, he was very different than the other gentleman who came to the car. Well, the other gentleman had dreadlocks, correct. Yes, you're talking, it's 80% average, but he was very different than the other person, and he was able to vocalize or explain that difference, and he was able to say, that is not the woman. Notwithstanding that she was taller, she was shorter, that is not the woman. He was rather definite on those issues. Well, people are often very definite in show of IDs, and that's the inherent problem with show of IDs. I mean, it's not just, I'm not saying that they're inherently suggestive or, I mean, the law says a dangerous degree of improper suggestion. That's not, you know, I'm not just saying that. That's what the Illinois Supreme Court has said, a dangerous degree of improper suggestion. That's why you're not supposed to do shows. I mean, that's why. If he had filed a motion to suppress, what would have been in that motion to suppress regarding that show-up? Why would it have been, why would they need to be suppressed? All the things that I'm just describing to you, whether this show-up should have, and then given that it's inherently suggestive, we can go through the bigger factors, and all of that would have been litigated as to whether Mr. Dowell had the opportunity to see he's in the front seat looking over his shoulder. There's other people there. There's three strangers he's never met before, and a shooting happens within minutes. There's a car getting lowered to the ground. There's spotlights. There's flashing lights going on. I mean, all of these factors that go into whether this inherently suggestive identification procedure was otherwise justified would have been litigated and I think would have been litigated successfully. There's also the problem here that was raised at trial, that trial counsel challenged the admissibility of the gunshot residue evidence. And you argue that the state had to establish a chain of custody for the gun residue, but really it was the blue jeans that were the evidence, weren't they? I mean, and certainly there was a foundation. In answer to that, I would ask you a question. How are the blue jeans relevant? They had gunshot residue on them. Correct, and the foundation has to be for the blue jeans. The gunshot residue has to land on something, isn't that correct? The item it landed on were the blue jeans. It could have landed on his shoes, which were then piled into this bag. He could have walked through. I mean, there was obviously a shooting in the area where he was. He walked in that area. They piled his shoes along with all of his clothes, first on the floor of the police station and then into a bag, which everyone admits. I mean, the judge says there's a real risk of contamination. That's the whole point of chain of custody, to show that there's no contamination. And so that's the problem. All right. Gravity says if this is gunshot residue from this incident, Gravity says it's going to go down. You're saying it's going to go up from the shoes that he was walking in? No, I'm saying they put his shoes in a bag with his clothes, so everything's intermingled. So the shoes that walked through the grass through the parking lot are touching his pants. That normally wouldn't happen. They don't even test the shoes. Well, he took the same – do we know he took the same path? Is that the issue here? No, the issue is that they piled everything together. I understand that, but how is he in that area of the gunshot residue? Are they following a path back and forth? Well, that's where his apartment is. Okay. So did it happen when – the issue is how do we know he took the exact same path? Well, we don't. Okay. But we know that there is a real risk of contamination, which is what you need chain of custody for, to prove that there was no contamination. Thank you. You'll have an opportunity to make a motion. Thank you. Good morning, Your Honors. First of all, a black man wearing a black shirt is indeed an exaggeration. The police are investigating around Brandon Lista Apartments. They know that it's a man, so they have eliminated half the population of the apartment complex, which would logically be women. We know that it is a black man, so they eliminated white men, Hispanic men, any Asian men. There's a little discrepancy in the height, but it tends to range from 5'7 to, I think, 6'. My recollection from the record was the defendant was 5'9, but I can't quote, you know, things like that. Well, did Mr. Dowell ever get out of the tow truck, or was he always sitting in the tow truck? He was sitting in the tow truck. So he's got a different perspective of height because tow trucks are a little higher, whereas Mr. Becknell is on the ground looking across. Okay. And Mr. Becknell actually saw him twice because he comes around to shoot a second time. We also know that the shooter is in his 20s. That eliminates anybody who's under 20, anybody who's 30, 40, 50, 60, 70. You notice the hair. We know that he doesn't have dreadlocks. He's not bald. There's no testimony about a beard or a mustache, so that eliminates another spot of black nails. There's no testimony about scars or tattoos. There is, as I said, a weight discrepancy, but they both describe the shooter as stockier than Mr. Dreadlocks. And there's also the clothing. You've eliminated anybody in business suits, anybody wearing a Hawaiian shirt, a brightly colored shirt, and anybody in sweatpants. So it's not just they're going out and looking for any of the local black men. It was also interesting that he noted that there were other black men in a different apartment. None of those men were taken out, presumably because they did not match the description. Could have been older men, could have been wearing brightly colored shirts or something, but they're not just randomly going around seizing black men willy-nilly. Well, there are some men on a balcony in the same building that they're interested in. My recollection, and I can't quote a site for this, is that when Officer Snow brought Kogi, I'm going to call him Kogi because I can't pronounce his last name well, the show-up guy. When Officer Snow brought Kogi back to the apartment, he's asking him to describe the scene. And my recollection is that he said that there were some people on a balcony and he saw their feet or something. So while Officer Snow stays with Kogi, I believe some of the other officers went up to investigate the apartment, either for witnesses or potential suspects. Those officers encounter the defendant and the female coming to the door of the apartment. So they radio down to Officer Snow that they have a potential suspect, and they're going to bring him down. As Officer Snow correctly did, he told Kogi this may or may not be the person. They brought the defendant down. He was a reasonable degree distance away. And he said, yes, that's the man that shot back there. Who was he asked to identify first, the young lady or the young man? The young man, the defendant. And then after they complete that identification, and also the defendant was not in handcuffs when he came down. Then after that, they brought the woman, and he's very definite that that's not the woman. They did a show up on the auto, and he said, no, the auto that we saw earlier was not the auto you're showing me. So that shows that he is not rubber stamping anybody the police bring to him as a potential suspect or person of interest. He's exercised his discretion. He's identifying the defendant because that's the man he saw. Counsel, if defense counsel really could have kept this identification out and certainly Becknell's identification out, it certainly would have been pretty difficult to convict this defendant, would it not? And so I guess the bottom line is, how is this not ineffective assistance of counsel for failing to file a motion to suppress here? Because particularly with Cody, the motion to suppress would not have been at all successful. And the reason is? Show up identifications near a scene of a crime or a proper police procedure. That's at Ramos at 897 Rodriguez 830. A fresh, accurate identification may lead to the immediate release of a suspect and enable the police to resume their search. That's also Ramos 897 Rodriguez 830. The way to be given identification is questioned for the prior fact. You only need one identification by a single witness to sustain a conviction. That's Ramos 901. In Steeke v. Henderson, which was cited in the defense brief, when they're talking about the show-up identification, that case says that a show-up conducted immediately after, ideally within two hours, can be beneficial because a fresh memory serves to balance any risk of undue suggestion. That's at 259. So there is no... It's not unnecessarily or impermissibly suggestive for the show-up with Cody. So there, I see... There's also... There's a case, I can't remember which it is, that says it is more than likely in identification cases that the identification is going to come in and not be suppressed and that then the safeguard is the evidence presented during direct, rigorous cross-examination, which we have here, and then arguments by counsel. So I, in all respect, I don't see any way that this would have been kept out. I also don't agree with that. So for Brecknell, I mean, how was there an independent basis for his in-court identification when he looked at a newspaper article that apparently had a mug shot? Well, you pointed out the ambiguity in this statement that I also noticed, is that, you know, he identified the defendant from the article. He didn't say that I only recognized him because they identified, but, you know, a reasonable interpretation is, in fact, that I saw his picture when I'm not medicated and I recognized the defendant from the incident. And for Mr. Becknell, he did fail to identify the defendant in the hospital. That was later in the day of the shooting. That's at 410. There were two other possible matches, or he said two of the other fillers were possible matches. He did not identify the defendant. But he also said he had little recollection of any conversation about his physical condition. That's at 414. And he thought that it was a male detective, but he wasn't sure. That's at 415. He saw the picture in the newspaper three to four days after his October 20th release. That's at 410. And he said that he recognized, you know, the defendant from the photo. But he never told the police or anyone else until a couple days before trial, though. Correct. He had actually spoken with the police October the 22nd, which would have been only two days after his release when he said he saw the photo three to eight days. I don't find it incredible that he didn't contact the police because they had identified the correct person. If it had been the wrong person, I could see him calling and saying, you know, you've got the wrong guy. But it's not shocking that he wouldn't, you know, call back and say, yeah, you know, you showed the right picture. But his testimony in court is very clear that he is identifying the defendant from the actual events. He also gave a description to Duffy at the hospital that it was a black male, about 6 foot, about 180 pounds, a black shirt and possibly blue jeans. And that testimony is at 707. Is that the first time we hear about the blue jeans? Because I don't, does Kobe ever talk about what, since he's in the truck, does he talk about anything else other than a shirt? I can't remember. I believe Kobe did mention blue jeans, but I can't remember at what point, whether it was in his trial or the pretrial description. So I don't want to mislead you about that. Becknell was, oh, the description that Becknell gave to the officer in the hospital was 10 minutes after he had gotten there, I believe, and that's at 708. And he did not describe any red letterings or stripes, doesn't say whether it's long sleeves, short sleeves, or a hoodie. That's at 708 and 709. And one of the other interesting things about the whole shirt controversy is that it is defense counsel who's trying to make the ID about the shirt. When Officer, I believe it was Snow, testified, he mentioned that he hadn't noticed any red markings on the shirt. Becknell, Officer Snow, his, Officer Snow's police report said it was a black shirt. That's at 820 to 821. And that's what Kobe said at the show-up, which is at 819 for Snow's testimony. Snow said that at the show-up he did not see red lettering or stripes, and that was at, I believe, 608 and 623. And then Becknell also described it as a black shirt. That's at 419 and 411. So that's consistent. The only time I believe that Kobe mentioned a sweatshirt was in the 911 call. But consistently, you know, three different witnesses are describing it as a black shirt. The jury had the shirt. They had the photos of the shirt. They are the parties that are, whose responsibility and duty it is to make those credibility assessments and weigh any conflicts in the evidence. What about the blue jeans and the gunshot residue? Do you agree with the counsel that there was lack of foundation for admission of the testimony regarding the gunshot residue? I'm sure you're going to be shocked, but no, I don't agree with them on that. I think it is agreed that it was not proper procedure for the officer to put it in a single bag. But if you follow defense counsel's argument to its logical, or perhaps in this case, illogical conclusion, you can never do gunshot residue testing. A defendant, in most cases, is going to be taken to the police station in a police car. He's going to walk into the station. So unless you convert him to the judgmental, avoid-the-bubble, you know, sterile environment, there's always a possibility of cross-contamination. In this case, the cross-contamination wouldn't have been from the defendant's own clothing because the officer put the shirt, the jeans, the shoes, and the belt in one pile and then in a bag. Well, they were first placed on the floor of the holding cell, though. And the officers testified that there are no guns allowed in that area, so you wouldn't have a transfer of gunshot residue. And they also said that the janitorial staff cleans the area. So, you know, as I said, unless, you know, you avoid the bubble in a sterile environment, how do you ever collect clothing in a police station? If you're taking your pants off, presumably the pants are going to touch the floor if you're taking them off, so you could collect, you know, possible contamination that way. As I said, you can never do a pair of shoes because you've walked into the station. If you walk into the station and brush against the wall, you could get all sorts of contamination. Couldn't there be contamination based upon the fact that this particular institution used cloth bags and they didn't wash them after every use? They didn't use plastic bags and throw them away after every use? I don't recall that testimony or that evidence from the record here. I do know that the officer, the actual evidence technician officer, who said that, in fact, it's not proper procedure to put it all in one bag, said that when he got the singular bag, he then took the items out and put them in separate individual bags to send them to the lab for testing. So are you saying this does not go to the admissibility but rather the weight of the testimony regarding the gunshot residue? Exactly. Well, you raised another interesting question that I hadn't thought about. He was not undressed by the police, he undressed himself, and so if there was residue on either hand, it could have transferred as well, correct? Yes. The standard in Illinois, or that our experts said, is three particles for a match. In this case, she said, you know, the front of the blue jeans made that three-marker match. She said that the defendant had, like, one particle on his hand, one particle on the front of his shirt that did not match. So she did not qualify that. But if the three-particle match, you know, is the standard, that's somewhat akin to a DUI. You know, you can get low at 2.5 or something, but the legal standard is 0.08. So if you're 0.08 or you're 0.09, you are, in fact, DUI. If you're 0.07, you are not. And yet they can't then... Well, that isn't quite true, but we're talking about presumptions. Correct. So, but, and, you know, in this case, you know, the defense counsel did a marvelous job of cross-examining. You know, all of these factors were brought before the jury, and that's part of the reason why he wasn't ineffective in not filing the motions. He's brought Becknell's identification before the jury, and by trying to cast doubt on that, you also try to do some collateral damage to Cody's, which is a very good and solid identification. So I see my time is up. Unless you have any more specific questions. We have no more questions. Thank you. Mr. Goetsch, you may proceed. Just a couple of quick points. The reason why the shirt was relevant was not because the defense counsel wanted it to be relevant. It was because Cody Dowell said, I remember the black shirt the shooter was wearing, and that's the guy, that's the shooter. So Cody Dowell made the shirt relevant, even though he had previously described it as a sweatshirt. He said, oh, yeah, that's the guy because that's the shirt. So that's why the shirt was relevant. Second, Becknell gave a recorded statement to the police after he was released from the hospital and before he made his newspaper identification, in which he said it was dark out, it was hard to see. That's why he couldn't identify someone. So even if he was drugged in the hospital, he had an opportunity after that to make an identification, in which he didn't. Did they give him another show-off, the same one they had given him in the hospital? I mean, that's one thing that I question, too. Why weren't there further attempts to make identification according to the statute? And that gets to my last point that I wanted to make on this topic. As to whether a motion to suppress would have been successful, the statute for doing proper identification procedures in Illinois says that failure to comply with any of the requirements of this section shall be a factor to be considered by the court in adjudicating a motion to suppress. So the fact that the police didn't follow procedure is a factor that the judge can consider and should consider in ruling on a motion to suppress. And that's why, another reason why, the defense counsel should have filed a motion to suppress these identifications, especially with respect to Becknell. There was no... They filed a procedure with Becknell. He doesn't make an identification. The only identifications that are made were not for Percy. I'm curious if there was supposed to be a second... I thought you were saying that there should be a follow-up review of the mug shots, why the police didn't do it. Correct. How would that have been formulated? Would it have been the same photographs or would they be different photographs but include the defendant in a new mix? Well, the police have a computer program that they use that per the statute follows the rules of the statute. So you have to have similar-looking photos. There's all these requirements. So my question to you is how similar should they be? Should they be the exact same ones that were done before or should they be slightly different? If it was A, B, C, D, E, should it be A, B, C, D, F, and the defendant is A? I mean, you hypothecate. I'd like to know what you would have done insofar as if there was another show-off, how it would have been formulated. Well, I would have allowed this computer program that formulates these things to comply with the statute to formulate. I mean, whether it has to be the same or not, I'm not sure. Well. They could have showed Dowell a proper photo ID lineup as well. What I don't know, and therefore I'm not going to speculate on, is whether the computer program, if it's run a second time, will come up with the same results or whether if it's run a second time it comes up with slightly altered results because there may be or may not be an algorithm that's involved. So my question to you is do you know if there's an algorithm involved and will it come up with the same selection the second time as it did the first time or will it come up with something different the second time? I don't know. I know they have a printout of the original. So, I mean, they could have determined that. Can they manually manipulate that program? I'm not aware of the technical specifics of it. I just know that that's what they used for Bethnell when he was in the hospital in an effort to comply with the statute. So unless there's further questions. Thank you. I don't have any other questions. Thank you. There will be, there are other pages in the hall. There will be a short recess.